UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Robert Byrnes</u>,
     Plaintiff

     v.                            Case No. 10-cv-551-SM
                                      Opinion No. 2012 DNH 028
<u>City of Manchester, NH;</u>
<u>Manchester Police Department;</u>
<u>Emmett Macken; and Derek M. Sullivan</u>,
     Defendants

**<u>O R D E R</u>**

Robert Byrnes brought this suit against the City of Manchester, its police department, and two of its police officers.  He claims that the officers violated his federal constitutional and state common law rights when they stopped his vehicle and arrested him for driving under the influence of alcohol.  Defendants say that the officers had reasonable suspicion and probable cause to support their actions and that, in any event, they are entitled to qualified immunity from suit.

**Standard of Review**

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record

reveals "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

The material facts are generally undisputed. To the extent they are contested, the court will, for the purpose of ruling on the pending motion for summary judgment, take the facts in the light most favorable to Byrnes, the party opposing summary judgment.

On Friday night, January 8, 2010, at around 11:30 p.m., Robert Byrnes, Matt Poulin, John Bixby, and Seth Manders exited Penuche's Grill, a well-known bar in Manchester, NH. They got into Byrnes's SUV, and drove to the 7-Eleven convenience store located at the corner of Bridge and Maple Streets. Poulin sat in the front passenger seat, Bixby in the rear seat behind him, and Manders in the back seat behind Byrnes, who was driving. Byrnes parked in front of the convenience store. The lot was well-lit.

Byrnes and Bixby exited the car and entered the store to buy
snacks.  Byrnes described the store as "not busy with customers,"
and he and Bixby "did not have to wait in line to make . . .
purchases."  Document No. 10-2, par. 7.  Nevertheless, it is
undisputed that cars were coming and going from the parking lot.

Parked to the left of Byrnes's car was an unmarked minivan
occupied by Manchester police detectives Emmett Macken and Derek
Sullivan.  According to plaintiff's account of the facts, the
minivan and Byrnes's car were parked "very close" to each other.
The two officers were assigned to the street crime unit.  To
blend into the general population, they wore plainclothes —
jeans, baseball hats, and sweatshirts.  They were undercover to
better observe and attempt to stop crimes in progress.  Sullivan
was in the driver's seat.  Macken sat in the front passenger
seat.

According to plaintiff's account, while Byrnes and Bixby
were in the store, Sullivan and Macken were looking over —
"staring" — at Manders and Poulin.  Manders, who had his window
rolled down, spoke to the officers asking, "What, did you forget
your i.d.?"  Macken heard Manders, but ignored him.  Manders then
said, "I heard we're supposed to get a couple of inches [of
snow]."  According to Bixby (who had by then exited the store and

re-entered the vehicle), Macken responded, "You don't know who you're talking to.  You better just walk away."  Manders replied "We're supposed to get a couple of inches of snow . . . .  I heard you got a couple inches."[1]  Soon after, a woman exited the store and walked in front of, or past, Byrnes's car.  As she walked by, Manders said to Macken "something along the lines of 'Not bad, huh?  Would you?,'" or "Hey, would you do her?"  In response, Macken told Manders that he was acting inappropriately.  Manders responded, "What, you want to suck my dick?"  Or, as Bixby recalled, "Seth said something to them about . . . suck his dick."  Document No. 6-5, at 3.[2]  Manders and the other passengers laughed while looking at the officers.  Manders did not make any threatening gestures, and the officers did not fear for their own safety.  The court credits plaintiff's account that

---

[1] Whether Manders was yelling is disputed.  For purposes of this motion, the court credits plaintiff's account that Manders was not yelling.

[2] Both Macken and Bixby testified that Manders made the comment. Although their recollections differ slightly, they are not materially different.  Citing to Manders's deposition testimony, however, Byrnes claims there is a disputed fact as to whether Manders made any such comment.  Although Manders said "no," when asked if he said "Suck my dick," he also testified that he really did not recall what he said because "it was pretty clear that I had a buzz on at that time."  Document No. 6-4, at 3.  Manders testimony, therefore, does not contradict the testimony given by Macken and Bixby.  Moreover, although plaintiff states in his brief that Poulin testified that Manders did not make the comment, that portion of Poulin's deposition was not produced.

Manders was not hanging out of the car window when he made the statement.

Macken conferred with Sullivan, and the officers radioed for a marked cruiser.[3]  In their depositions and affidavits, the officers said they wanted to speak with Manders in order to head off trouble, but thought it best to do so with a uniformed officer present.  The officers testified that they believed Manders had committed the offense of disorderly conduct by "trying to goad strangers into a fight," but it is undisputed that the officers did not intend to arrest Manders or any of the other passengers at the scene.  Macken Aff., Document No. 6-3, par. 8.  They said it appeared to them that Manders was looking for trouble and they were concerned that he might end up in a physical altercation with someone else.  Macken testified: "[I]f . . . somebody told you to suck their dick that you didn't know . . . a lot of people out here at night in Manchester are going to react in a violent way probably towards that person . . . ."

---

[3] In the officers' experience, subjects who appear rowdy or engaged in criminal activity will not always respond to an officer who is not in uniform.  The officers testified that they called for the marked cruiser because they felt a show of authority by a uniformed officer would avoid involving them in a needless physical altercation.

While Sullivan was on the radio calling for the marked cruiser, Manders asked Macken if he had any jokes.  Macken responded "Yup, we're about to."  About the same time, Byrnes exited the store.  He noticed the "exchange" between Manders and Macken.  When he got into the car, Byrnes asked Manders what was going on.  Manders told him that Macken "had a problem."  Byrnes looked over to Macken.  Macken said "Why don't you get out of here," to which Byrnes replied, "Oh, really, Nice mini van.  You couldn't afford the expensive model?"  Byrnes laughed, backed out of the parking space, and pulled up within eight feet from the minivan.  Macken told him to "go bounce."  Byrnes replied, "Yeah, bounce."  Byrnes and his passengers laughed.  Macken later testified that he did not believe the men were "engaging" him, but were just laughing.  Byrnes then pulled out of the parking lot and onto Bridge Street, before the marked cruiser arrived.

Sullivan and Macken followed Byrnes's vehicle to identify it for the uniformed officer, Todd Leshney, who was responding to their call.  Sullivan and Macken observed Byrnes turn off Bridge Street and onto Mammoth Road.  Except for purportedly observing Byrnes's failure to use a turn signal,[4] the officers did not

---

[4] Sullivan and Macken testified that Byrnes did not use his directional signal when making the turn.  Because Byrnes testified that he did use the turn signal, the court accepts Byrnes's account for purposes of the present motion.

observe anything unusual about Byrnes's driving.  Officer Leshney
caught up and pulled onto Mammoth Road in the marked cruiser.  He
pulled Byrnes's vehicle over, approached the driver's side
window, and asked Byrnes to produce his license and registration.
While retrieving those documents, Byrnes asked Leshney why he had
been pulled over.  Leshney did not answer, but took the documents
and walked back to the cruiser.  When asked during his deposition
whether he had observed anything that would have led him to
believe that Byrnes was intoxicated, Leshney replied, "I didn't
make any observations, no."  That statement is consistent with
his explanation that, if he thought a driver was drunk or
otherwise impaired, he would not return to the cruiser, but would
stay with the driver to investigate a possible DUI.

    After Leshney walked away, Sullivan approached Byrnes and
Macken approached Manders.  Macken either pulled Manders out of
the vehicle or asked him to exit.  Manders appeared to be
intoxicated.  Macken demanded, "[D]id you tell me to suck your
dick?  How about now?  How about now?"  Macken then admonished
Manders about the danger of speaking to people in the way he had
spoken to the officers.  "I explained that the way he was acting
could have caused a fight or other violence if we had not been
police officers, and that you never know who you may be dealing
with."  Manders apologized "because [he] felt as though maybe

[he] brought this upon Rob [Byrnes] by telling [Macken] that
joke." He told Macken, "I'm sorry. I didn't know you were an
officer." Macken then ran Manders's name through dispatch to
check for outstanding warrants. After learning there were none,
Macken acceded to Manders's request that he be allowed to re-
enter the vehicle to warm-up. Manders was not placed under
arrest.

While Macken was dealing with Manders, Sullivan was at
Byrnes's window. Byrnes testified that "he detected a strong
odor of alcohol, and [he] observed Byrnes's eyes to be glossy and
bloodshot and his speech to be slurred." When Sullivan asked
Byrnes if he had been drinking, Byrnes said that he had had one
beer that evening. Byrnes asked Sullivan why he had been pulled
over, but Sullivan did not answer. Sullivan then left the side
of the vehicle for a few moments. When he returned, he noticed
that Byrnes was chewing gum. Byrnes later testified that he did
not begin chewing gum in response to being pulled over, but,
instead, had been chewing gum all evening. Sullivan then asked
Byrnes three or four times to exit the vehicle to perform a field
sobriety test. Byrnes refused each request, instead asking
Sullivan repeatedly why he had been pulled over. According to
Byrnes, Sullivan never answered his questions.

Sullivan ordered Byrnes to unlock the door, and, when Byrnes refused, Sullivan grabbed him by the jacket to pull him out of the car.  But Byrnes relented and exited the vehicle of his own accord.  Sullivan placed Byrnes under arrest for DUI.  Sullivan later testified that Byrnes did not stumble when he exited the vehicle and did not exhibit any difficulty walking with his hands cuffed behind his back.  He did not sway and could stand without losing his balance.

Byrnes was transported to the police station where he refused to submit to a breathalyzer test.  Macken filled out the Department of Motor Vehicles report necessary to initiate a statutory suspension of Byrnes's driving privileges for refusal to take the breathalyzer test.  Byrnes was booked, photographed, fingerprinted, and placed in a cell for approximately sixteen minutes.  Macken later testified that, while Byrnes was at the station, he did not sway or stumble, he listened to Macken's commands, and was cooperative.

Upon his release from police custody, Byrnes was served with summonses for Driving While Intoxicated, N.H. Rev. Stat. Ann. ch. ("RSA") 265-A:2, and Failure to Use Directional, RSA 265:45. Approximately one hour elapsed from the time Byrnes was placed

under arrest until the time he left the station.  The City
Solicitor subsequently nol prossed both charges.


Byrnes filed a fifteen count complaint in the state superior
court, alleging defendants violated his Fourth and Fourteenth
Amendment rights and various state laws.  Defendants removed the
case to this court, invoking federal question jurisdiction.  The
parties completed discovery and defendants filed motions for
summary judgment as to all counts.  In response, Byrnes withdrew
seven counts[5] and objected to the motion as to Counts I, II, III,
and IV (the federal claims) and Counts XI, XII, XIII, and XV (the
state claims).


## Discussion

I.   Counts I and II

The Fourth Amendment guarantees "[t]he right of the people
to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures."  U.S. CONST. amend.
IV.  In Counts I and II of his complaint, Byrnes says the vehicle
stop, the extension of that stop to investigate his possible DUI,
and his arrest for DUI, all constituted unreasonable seizures in
violation of his Fourth Amendment rights.  Defendants say they

---

[5] Those counts have been dismissed with prejudice.  See Endorsed
Order dated October 27, 2011.

are entitled, both on qualified immunity grounds and on the
merits, to summary judgment in their favor with respect to
Byrnes's Fourth Amendment claims.  The court agrees.

> *A.   Byrnes's Claims*

Byrnes's Fourth Amendment claims address the three distinct
seizures, and fall into two broad categories.  In the first
category are Byrnes's claims that the vehicle stop, the extension
of that stop to investigate possible DUI (including the officers'
request that he submit to field sobriety testing), and his arrest
for DUI, were all unreasonable seizures, because they were not —
measured objectively — supported by reasonable suspicion and/or
probable cause.  In the second category are claims that focus on
the officers' alleged improper motives in effecting the stop and
arrest.  As to all three seizures, Byrnes claims the officers
were motivated, not by probable cause or reasonable suspicion,
but by a subjective desire to exact revenge for "injured pride"
resulting from the interaction with Manders and Byrnes in the
parking lot.  Byrnes contends that he is entitled to prevail on
these claims even if, objectively, probable cause or reasonable
suspicion for the stop and arrest existed at the time.

Those claims falling within the second category are not
viable.  The Supreme Court, in <u>Whren v. United States</u>, 517 U.S.

806 (1996), unequivocally held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 811, 813 (rejecting "the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred."). Whren's holding is grounded in the notion "that the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." Id. at 814 (emphasis in original).[6] Defendants, therefore, are entitled to judgment as a matter of law on all claims asserting that the officers' actions were unreasonable because they were motivated by a subjective desire for revenge.[7]  See MacDonald v. Town of Windham, Civil No. 06-cv-245-JD, 2007 WL 4012581, at *6 (D.N.H. Nov. 16, 2007) (entering summary judgment in favor of defendants; plaintiffs' claim that arrest was motivated by desire to harass held irrelevant to the probable cause inquiry).

With respect to those claims alleging that the officers acted without reasonable suspicion or probable cause, the court

---

[6] Under this circuit's precedent, Whren's holding is not confined to probable cause cases, but also applies in cases where reasonable suspicion is at issue.  See United States v. McGregor, 650 F.3d 813, 822 (1st Cir. 2011).

[7] Byrnes did not bring any of his claims under the First Amendment.

finds, for the following reasons, that defendants are entitled to summary judgment.

   *B.   The Stop*

   "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief."  <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979).  Byrnes claims that when the officers stopped his car they engaged in an unreasonable seizure under the Fourth Amendment because the officers lacked reasonable suspicion (or probable cause) to believe that Manders had committed the offense of disorderly conduct (the basis of the stop).  "Probable cause" arises from the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  <u>Kay v. New Hampshire Democratic Party</u>, 821 F.2d 31, 34 n.6 (1st Cir. 1997); <u>Burke v. Town of Walpole</u>, 405 F.3d 66, 80 (1st Cir. 2005).

   Defendants concede that they seized Byrnes when they stopped his vehicle, and they do not dispute Byrnes's standing to challenge the seizure's reasonableness.  See <u>United States v.</u>

13

Sower, 136 F.3d 24, 27 (1st Cir. 1998) (both driver and passenger may challenge the detention). They argue, however, that under Terry v. Ohio, 392 U.S. 1 (1968) and Prouse, 440 U.S. at 663, the stop was reasonable because they had an "articulable and reasonable suspicion," id., that Manders had committed the offense of disorderly conduct in the 7-Eleven parking lot, and was likely to commit the same offense in the near future, absent police intervention. Document No. 6-1, at 10-14.

The officers personally witnessed Manders's behavior in the parking lot. They testified that they did not intend to arrest him for being disorderly at that point, but did want to speak to him in an effort to curtail similar provocative behavior that they thought might later result in fights or public disturbances. Police officers, of course, retain discretion not to effect an arrest, even though probable cause to do so is established, if they determine that a less restrictive response to crime is appropriate. According to Macken:

> We originally wanted to approach the vehicle with the aid of a marked unit based on what we believed was disorderly conduct displayed by Mr. Manders in the parking lot. We were concerned that the occupants of the vehicle appeared to be trying to goad strangers into a fight, and that they were looking to cause trouble that might end in a physical altercation with someone else if not us. Based on my experience, often just speaking with persons in circumstances like this can cause them to become less disorderly and can diffuse a situation.

14

Macken Aff., Document No. 6-3, par. 8.  Macken also explained his
thought process this way:

> Like I said, this guy's going to be a problem maybe,
> you know.  I mean, maybe it's not me, but five minutes
> later maybe he says something stupid to somebody and
> we're going to have to respond anyway, one of our
> officers is, to clean up the mess maybe.

Macken Dep., Document No. 15-3, at 51-52.

Byrnes argues, at least implicitly, that there was nothing
for the officers to "investigate," and so no reason to stop his
car, once it left the parking lot.  To be sure, Manders's conduct
was already complete when Byrnes drove away.  But, it is also
clear that the undercover officers decided to stop Byrnes's car
before it left, delaying only until a uniformed officer arrived.
Had the uniformed officer arrived before Byrnes left, the car
(and Manders) would have been detained in the parking lot.  That
the process of detaining Byrnes's car and its occupants played
out over several minutes and a relatively short distance is of
little consequence.

The question remains whether, under the circumstances, the
car was pulled over based upon probable cause to believe that
Manders had committed the offense of disorderly conduct in the
officers' presence.  The issue is one of "probable cause" rather

15

than "reasonable suspicion," because, as Manders notes, the
officers had all the information necessary to determine whether
Manders was disorderly before he left the parking lot.  The
conduct either did or did not fit within the statutory
prohibition.

As discussed more fully _infra_, a person is disorderly under
New Hampshire law if he or she, among other things, "directs at
another person in a public place, obscene, derisive, or offensive
words which are likely to provoke a violent reaction on the part
of an ordinary person."  RSA 644:2, II(b).  When a disorderly
conduct charge is based on provocative words, those words must,
consistently with First Amendment protection, constitute
"fighting words," or words that "create a substantial and
unjustifiable risk of violent reaction on the part of an ordinary
person."  State v. Boulais, 150 N.H. 216, 218 (2003).

A prudent person, a person of reasonable caution, who
observed Manders's behavior would likely believe that he
committed the offense of disorderly conduct.  "Suck my dick" is a
taunt that most people would probably characterize as one likely
to create a substantial and unjustifiable risk of violent
reaction on the part of a person of ordinary sensibility.  And,
"[t]he probable cause standard does not require the officers'

16

conclusion to be ironclad, or even highly probable . . . [It]
. . . need only be reasonable." United States v. Winchenbach,
197 F.3d 548, 555-56 (1st Cir. 1999).  Under the circumstances
faced by Macken and Sullivan, their conclusion that Manders's
public behavior ran afoul of the disorderly conduct statute was
reasonable, and probable cause to arrest him for that suspected
offense existed.

While a plausible argument could certainly be made that such
taunts no longer pose a risk of provoking violence in a society
increasingly exposed to rough and crude language, and the
officers should have known that Manders's speech was too tame to
support probable cause to believe he was being disorderly, it is
not critical to wrestle with that issue here.  Whatever the
correct answer with respect to probable cause to stop Byrnes's
car, the officers are unquestionably entitled under these
circumstances to qualified immunity from liability and from being
sued.

<u>Qualified Immunity</u>

Sullivan and Macken are protected by qualified immunity if
the existence of probable cause to believe Manders engaged in
disorderly conduct was "at least arguable." Prokey v. Watkins,
942 F.2d 67, 72 (1st Cir. 1991).  A government official is

17

entitled to "'qualified immunity from personal liability for actions taken while performing discretionary functions.'"  Barton v. Clancy, 632 F.3d 9, 21 (1st Cir. 2011) (quoting Lynch v. City of Boston, 180 F.3d 1, 13 (1st Cir. 1999).  A defendant does not lose the protection of qualified immunity if he acts mistakenly, as long as his mistake was objectively reasonable, as qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law."  Veilleux v. Perschau, 101 F.3d 1, 3 (1st Cir. 1996) (quotation omitted).


In determining whether an official is entitled to qualified immunity, the court must decide "'(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation.'"  Barton, 632 F.3d at 21-22 (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).  The court "may conduct this inquiry sequentially, or resolve a particular case on the second prong alone."  Id. at 22.  In addressing the second prong, the court must be mindful that "'[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Id. (quoting Maldonado, 568 F.3d at 269).

18

When, as here, a seizure is challenged on grounds that the officers lacked reasonable suspicion (or probable cause), the qualified immunity inquiry does not require the court to decide whether probable cause actually existed, but rather, "whether a reasonable officer could have believed that it did."  <u>Eldredge v. Town of Falmouth</u>, 662 F.3d 100, 106 (1st Cir. 2011).  Put another way, defendants are protected by qualified immunity "so long as the presence of [probable cause] is at least arguable."  <u>Id</u>. (brackets and quotation marks removed).  Accordingly, for purposes of the qualified immunity inquiry in this case, the dispositive question is whether it was at least arguable that probable cause existed to believe Manders engaged in disorderly conduct within the meaning of RSA 644:2, II(b).

The New Hampshire disorderly conduct statute provides, in part, that "[a] person is guilty of disorderly conduct if":

> II.  He or she:
>
>> (b) <u>directs at another person in a public place, obscene, derisive, or offensive words which are likely to provoke a violent reaction on the part of an ordinary person.</u>

RSA 644:2 (emphasis added).

Defendants say they reasonably thought that Manders, in directing the words "suck my dick" to the officers, violated

§ II(b), which prohibits words uttered in public that are "likely to provoke a violent reaction in an ordinary person."  They also thought, given his attitude and conduct, that Manders was likely to repeat the offense in the near future at some other place if they did not intervene to admonish him.[8]

Byrnes counters that, under clearly established law at the time, Manders's comment did not constitute "fighting words" likely to provoke violence, and any objectively reasonable officer would have known that.  He further contends that, even if the comment was of the sort likely to provoke a violent reaction, it could not constitute disorderly conduct because the comment was directed to police officers, and they should have known that a higher provocative standard applies to comments directed at police officers.  Byrnes's position is not supported by applicable law.

---

[8] Defendants also contend that Manders's comment "would you?" or "would you do her?" in reference to the woman who was walking by violated §§ II(b) and III(a).  Because there are material factual disputes regarding Manders's comment to or about the woman (e.g., precisely what was said, how loud he was, whether she likely heard him, whether she or anyone else was disturbed), the comment cannot be deemed on summary judgment to be violative of Section II(b).

1.   <u>Likely to Provoke Violence</u>

In <u>State v. Oliveira</u>, 115 N.H. 559, 562 (1975), the New Hampshire Supreme Court, consistent with federal constitutional norms, construed the disorderly conduct statute as excluding from its reach offensive words that do not rise to the level of "fighting words."  <u>Id</u>.  Applying First Amendment principles laid down by the United States Supreme Court in <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 573 (1942) and <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 308 (1940), the court in <u>Oliveira</u> held that the defendant's use of the words "f--kin pigs" and "F--k the political pigs" in a speech were not actionable under the state statute because they were not fighting words.  <u>Oliveira</u>, 115 N.H. at 560-61.  Consistent with those precedents, the state supreme court, in a more recent decision, held that § II(b) of the disorderly conduct statute prohibits behavior and speech that "create a substantial and unjustifiable risk of violent reaction on the part of an ordinary person."  <u>State v. Boulais</u>, 150 N.H. 216, 220 (2003).

As Byrnes acknowledges, under federal law an "invitation to exchange fisticuffs" constitutes fighting words.  <u>Texas v. Johnson</u>, 491 U.S. 397, 409 (1989).  "Fighting words" also include personal, face-to-face insults that would likely provoke the average addressee to immediate violent reaction.  <u>See</u> <u>Chaplinsky</u>,

315 U.S. at 573; <u>Cohen v. California</u>, 403 U.S. 15, 20 (1971).
Words directed at known police officers, however, generally must
exceed a higher threshold of provocation in order to constitute
fighting words.  <u>See</u> <u>City of Houston v. Hill</u>, 482 U.S. 451, 461
(1987).  ("[T]he First Amendment protects a significant amount of
verbal criticism and challenge directed at police officers.").
Here, of course, Manders had no idea that he was addressing
police officers, and his words were hardly meant as social or
political criticism of or a challenge to police officers' actions
or law enforcement policy.

    Although these general constitutional and state statutory
rules were clearly established at the time, they do not apply
"'with obvious clarity to the specific conduct' at issue," such
that the officers' conduct was clearly forbidden.  <u>Jennings v.
Jones</u>, 499 F.3d 2, 16 (1st Cir. 2007) (quoting <u>United States v.
Lanier</u>, 520 U.S. 259, 271 (1997)).  There is no precedent, at
least none brought to the court's attention, establishing that
Manders's taunt did not constitute fighting words.  At the very
least, an objectively reasonable officer could easily have
believed that Manders's words amounted to fighting words in the
context, and under the circumstances, in which he uttered them.

It is undisputed that Manders had been drinking (he had a "buzz on"), and had been trying to engage men that, to him, were ordinary citizens, in a back and forth exchange through the rolled down window.  By Byrnes's own account, the officers and Manders were physically "very close" because the vehicles were parked next to each other.  Manders's "suck my dick" comment came on the heels of his having made a crude and offensive public comment to, or about, a woman passing by, and, the taunt came after the undercover officers objected to his comment as inappropriate.  An objective and reasonable officer confronted by those circumstances could have reasonably believed that Manders's disturbing behavior was escalating, and that his "suck my dick" taunt crossed the threshold into the realm of fighting words.

Byrnes looks to the state supreme court's decision in State v. Boulais, 150 N.H. 216 (2003), for relief, arguing that it clearly prohibited the officers' seizure.  In Boulais, the court reversed a conviction for disorderly conduct under the same statutory provision at issue in this case, § II(b).  It found that the defendant's offensive, sexually suggestive remarks to individual women at his workplace did not "create a substantial and unjustifiable risk of violent reaction on the part of an ordinary person."  Id. at 220.  Although the women experienced "feelings of outrage, discomfort, and humiliation," the court

held that such "internal emotional response[s]" did not meet the statute's "violent reaction element."  Id. at 218, 220.  The court also noted that defendant's "direct invitations for sexual activity were made outside of the presence of others and, therefore, were unlikely to create a breach of the peace."  Id.

But the facts here are markedly different from those in Boulais.  Here Manders's words "suck my dick," hardly constituted sexually suggestive remarks or an invitation for sexual activity. Those words were properly understood by the officers as a humiliating and denigrating challenge — the kind of taunt very likely to be perceived as a challenge to either fight or submit to the humiliation intended.  The risk of a violent reaction on the part of an ordinary person so taunted in the escalating situation in the parking lot was substantial.  In short, the facts here are "materially [dis]similar," such that the ruling in Boulais would not have given Sullivan and Macken "fair warning that their conduct [in pulling over Byrnes's car based upon probable cause to believe that the offense of disorderly conduct had been committed by one of its occupants] violated plaintiff's constitutional rights."  Jennings, 499 F.3d at 16 (quotation omitted).

2.  <u>Provocative Speech Directed at Police Officers</u>

Byrnes also argues that, even if Manders's speech was "likely to provoke a violent reaction on the part of an ordinary person," RSA 644:2, II(b), it was clearly established at the time, under federal and state law, that provocative speech does not constitute disorderly conduct when it is directed at police officers.

To the contrary, it is not at all clear that § II(b) does not criminalize fighting words directed at police officers. First, the state supreme court's decision in <u>Murray</u>, 135 N.H. 369, on which Byrnes primarily relies, provides no clear state rule.  In that case, defendant appealed her disorderly conduct conviction under the "loud or unreasonable noises" prohibition of § III(a).  <u>Id</u>. at 372.  Defendant, who was a passenger in a car driven by her boyfriend, was charged under that subsection of the statute for having yelled obscenities at an officer who was arresting her boyfriend.  <u>Id</u>. at 370.  The court reversed defendant's conviction, holding that someone other than an arresting officer must be disturbed for there to be a public disturbance under § III(a).  <u>Id</u>. at 372-73.  Importantly, the court did not consider whether the same requirement applies to offenses arising under § II(b) of the statute, the provision at issue here.  <u>Id</u>.

25

Second, the court in <u>Murray</u> may have been concerned, consistent with First Amendment jurisprudence, with preserving an interest not implicated here — an individual's right to speak out against official police activities.  <u>See</u> <u>id.</u> at 372-73 <u>relying on</u> <u>State v. John W.</u>, 418 A.2d 1097, 1108 (Me. 1980).  <u>See also</u> <u>Norwell v. Cincinnati</u>, 414 U.S. 14 (1973) (per curiam ) (reversing conviction for disorderly conduct for "loud and boisterous" speech, because a person "is not to be punished for <u>nonprovocatively</u> voicing his objection to what he obviously felt was a highly questionable detention by a police officer" (emphasis supplied)); <u>Veiga v. McGee</u>, 26 F.3d 1206, 1213 (1st Cir. 1994) ("The district court correctly instructed the jury that '[i]t would be unlawful for the police officers to detain Mr. Veiga for refusing to answer their questions or for challenging them.'").

Unlike the plaintiffs in <u>Murray</u>, <u>Norwell</u>, and <u>Veiga</u>, Manders had no idea that Sullivan and Macken were police officers. Moreover, the comment at issue here was not, as in those cases, in protest of official police activities or policies.  It was, instead, directed to men Manders thought to be members of the general public, and "in advance of police intrusion and arrest." <u>See</u> <u>State v. Griatzky</u>, 587 A.2d 234, 238 (Me. 1991) (rejecting defendant's argument "that words alone will never support a

26

conviction for disorderly conduct when the words are addressed to a police officer," where words were uttered prior to, and not in response to, arrest).  Byrnes has not pointed to any federal precedent, much less precedent from this circuit, that clearly establishes a rule precluding the possibility of a disorderly conduct offense arising from fighting words directed at a police officer (or a police officer thought by the provocateur to be an ordinary citizen).

For these reasons, it was not "clearly established" at the time of the vehicle stop that fighting words directed at plainclothes police officers in advance of any known police action, cannot violate § II(b) of New Hampshire's disorderly conduct statute.  It was also not clearly established, as a matter of federal law, that a vehicle stop, based upon a belief that Manders's taunt qualified as disorderly conduct under applicable state law, would clearly violate Byrnes's Fourth Amendment rights.

In sum, a reasonable and prudent officer, considering the circumstances, could have reasonably thought, given the governing legal precedent and the "situation he confronted," Jennings, 499 F.3d at 10, that probable cause existed to believe Manders uttered words of the sort and under circumstances likely to

27

provoke a violent reaction on the part of an ordinary person, within the meaning of the state's disorderly conduct statute.  In the end, the court "cannot say that [the officers'] assessment was so obviously misguided that no reasonable officer could have reached that same conclusion."  <u>Eldredge</u>, 662 F.3d at 107.

>    C.    *The Extension of the Stop to*
>          *Investigate DUI and the Subsequent Arrest*

In addition to challenging the initial seizure (<u>i.e.</u>, the vehicle stop), Byrnes challenges the officers' decision to extend the seizure for the purpose of investigating a possible DUI offense.  He also challenges their subsequent decision to place him under arrest for driving under the influence of alcohol.  Defendants respond that the undisputed facts establish that the officers' actions did not violate Byrnes's constitutional rights, and, in any event, they are entitled to qualified immunity.

>    1.    <u>Extended Stop and Request</u>
>          <u>for Field Sobriety Testing</u>

Although an initial stop may be lawful, "the court [must] . . . consider […] whether an extension of the detention was reasonable."  <u>United States v. Anderson</u>, 10-cr-84-JD, 2011 WL 1304218, at *6 (D.N.H. April 6, 2011) (citing <u>United States v. Ramos</u>, 629 F.3d 60, 65 (1st Cir. 2010).  If an "initial stop [is] not based on a suspicion that the [driver] was impaired," the

officer "must demonstrate a reasonable suspicion" of DUI in order
to justify "extend[ing] the scope of his stop" to investigate
that possible offense.  United States v. Caine, 517 F. Supp. 2d
586, 589 (D. Mass. 2007).  In determining whether officers had a
reasonable suspicion of DUI that would justify extending the
stop, the court looks to the "totality of the circumstances."
United States v. Arvizu, 534 U.S. 266, 273 (2002).  The court
must, moreover, be mindful that the "officers [may] draw on their
own experience and specialized training to make inferences from
and deductions about the cumulative information available to them
that might well elude an untrained person."  Id. (quotation
omitted).

    There is no doubt, as Byrnes contends, that some facts on
which defendants rely to establish reasonable suspicion of DUI
are disputed.  For example, Byrnes's sworn statement that he
began chewing gum prior to the stop and not in response to it;
that he used his turn signal when approaching Mammoth Road; and
that his speech was not slurred, all directly contradict the
officers' sworn accounts.  Those disputed facts are relevant to a
court's inquiry into reasonable suspicion of driving under the
influence of alcohol.  See e.g., Leibin v. Town of Avon, No.
3:08CV266, 2010 WL 3038100, at *4 (D. Conn. Aug. 4, 2010)
(chewing gum); Hodsdon v. Town of Greenville, 52 F. Supp. 2d 117,

121 (D. Me. 1999) (moving violation); <u>Finucane v. Town of
Belchertown</u>, 808 F. Supp. 906, 910 (D. Mass. 1992) (slurred
speech).

Nevertheless, even accepting those facts as Byrnes presents
them, the officers still had sufficient information, undisputed
on this record, to form a reasonable suspicion that Byrnes was
driving under the influence.

First, it is undisputed that Byrnes admitted to Sullivan
that he had been drinking.  It is also undisputed that Byrnes's
eyes were "glossy" and red.  Officer Sullivan stated as much in
his report and made the same averment in his affidavit.  Document
No. 15-2, at 1; Sullivan Aff., Document No. 6-2, par. 9.  When
asked at his deposition whether he disagreed with the statement,
Byrnes did not deny its truth, but instead conceded it, albeit
with an explanation: "If we could get the weather for that day, I
think it was eight degrees out, really windy.  Everyone was red
eyes and bloodshot and glossy and whatever, face flushed."
Document No. 15-2, at 1.  Consistently, in responding to a
statement by Officer Macken that he had observed "Robert's eyes
[to be] glossy, and his face . . . flushed," Byrnes again offered
an explanation, not a denial: "I hope so.  It was freezing out.

30

It was eight or nine degrees out that night and very windy."
Document No. 15-2, at 2.

Byrnes, nevertheless, posits that the condition of his eyes
is a material fact sufficiently disputed by Officer Leshney's
deposition testimony, and Byrnes's own recent affidavit — which
he says contains an averment that his "eyes were not glossy
and/or bloodshot." See Document No. 10-1, at 12.  As for the
affidavit, it simply does not contain the referenced statement.
And even if it did, it would be inconsistent with Byrnes's own
prior deposition testimony.  Absent a solid explanation for such
an inconsistency, a later-produced and contradictory statement is
generally given no weight.  See Forrester Environmental Services
v. Wheelabrator Tech., Inc., 10-cv-154-JL, 2011 WL 6300536, 6
(D.N.H. Dec. 16, 2011) ("[T]he court may, in some circumstances,
disregard summary judgment affidavits that are 'inherently
untrustworthy' insofar as they contradict earlier sworn testimony
without providing any explanation for the discrepancy . . . .").

Officer Leshney's testimony also does not contradict
Sullivan's testimony, at least not in a material way.  Leshney
testified as follows:

    Q:  Do you recall making any observations on January 8,
    2010 at the driver's side window of my client's car

31

that led you to believe that he was impaired by
intoxicating liquor?

A:  I didn't make any observations, no.  I also didn't
ask him any questions to determine whether he was
impaired or not.

Q:  Is that because you didn't have any reasonable
basis to believe that he was impaired?

A:  It wasn't my investigation.  I didn't want to
compromise Macken and Sullivan's investigation by
standing there and now starting to ask questions that I
didn't know or didn't feel that it was my job to start
questioning the driver.  It wasn't my — I mean, it was
my stop in the respect that I pulled the vehicle over,
but they were requesting it to be pulled over; whether
it was me or it was another officer, somebody with a
marked unit was going to pull this car over because
they were requesting it to be done.  I wasn't going to
start asking anybody any questions inside the car.

Document No. 41-1, at 36-37.


    Leshney's testimony adds little support to Byrnes's

position.  He undertook neither to ask questions about, nor to

observe whether Byrnes showed signs of impairment.  That Leshney

"did not observe any indicia of intoxication" is not the same

thing as "he observed that Byrnes's eyes were not glossy and

bloodshot."  Without additional explanation from Leshney, the

difference between his account and that of Sullivan more likely

"reflect[s] the officers' different apprehensions of the same

circumstances from their own vantage points."  United States v.

Rodgers, 109 F.3d 1138, 1142 (6th Cir. 1997) (finding no

inconsistencies among the officers' accounts).  Sullivan

describes what he saw that led him to suspect DUI; Leshney says he did not make observations or ask questions related to a possible DUI offense.

Finally, although not pointed out by defendants, Byrnes does not dispute Macken's assertion that Manders, a passenger in Byrnes's vehicle, "appeared to be intoxicated and unsteady on his feet."  Although "insufficient, without more," to establish a reasonable suspicion with respect to Byrnes, that Byrnes's companion was intoxicated is another factor that may contribute to the formation of reasonable suspicion that Byrnes also was intoxicated.  Klauke v. Daly, 595 F.3d 20, 25 (1st Cir. 2010) (officer had reasonable suspicion that plaintiff was in possession of alcohol where, among other things, "[i]t was a Saturday night" and plaintiff "was walking in a group in which his companions were openly carrying alcohol").  See also Tremblay v. McClellan, 350 F.3d 195, 201 (1st Cir. 2003) ("There was also a reasonable basis to suspect that Jason had been drinking . . . .  Jason was with Dale [an intoxicated friend], making reasonable a suspicion that Jason had also been drinking . . . .").[9]

---

[9] It does not matter that Detective Macken, and not Sullivan, observed that Manders was intoxicated.  Both officers were at the scene and there was at least general communication between them. "It is enough that the collective knowledge and information of all the officers involved establishes" reasonable suspicion.

Accordingly, facts undisputedly available to the officers at the time, _i.e._, Byrnes's glassy and bloodshot eyes, the odor of alcohol, Byrnes's admission that he had been drinking, and the fact that at least one of Byrnes's companions had, at the time of the stop, appeared to be intoxicated, gave the officers reasonable grounds to extend the stop to investigate a possible DUI.  See e.g., United States v. Cain, 517 F. Supp. 2d 586, 589 (D. Mass. 2007) (officer had reasonable suspicion of DUI where, among other things, defendant's "eyes were glassy and bloodshot" and she admitted that "she had been drinking earlier"); Miller v. Harget, 458 F.3d 1251, 1259-60 (11th Cir. 2006) (officer had reasonable suspicion of DUI where he "smelled alcohol" and "one occupant of the car . . . had been drinking."); see also Sjoberg v. Kansas Dept. of Revenue, 261 P.3d 569 (Kan. App. 2011) ("The odor of alcohol, bloodshot eyes, and admission of drinking gave the officer reasonable grounds here to detain Sjoberg for further investigation.").

Because Sullivan had reasonable suspicion warranting further investigation, he was entitled to ask Byrnes to submit to field

---

United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986) (collective knowledge established probable cause).  See also United States v. Waldrop, 404 F.3d 365, 370 (5th Cir. 2005) ("[P]robable cause determinations may be based upon the collective knowledge of the police officers at the scene, as long as there was some general communication between the officers.").

sobriety testing to "'quell or confirm [his] suspicions.'" <u>United States v. Snow</u>, No. 10-00865-MBB, 2010 WL 3070142, at *4-5 (D. Mass. Aug. 5, 2010) (conducting field sobriety test "is reasonable under . . . the <u>Terry</u> analysis where . . . [the officer] has reasonable suspicion that a driver is impaired.") (alteration in original) (quoting <u>Klauke</u>, 595 F.3d at 25).

Defendants are entitled to summary judgment on the merits of plaintiff's claim that the extension of the stop to investigate a possible DUI was unreasonable.

Of course, given the described circumstances, it was also plainly "arguable" that Sullivan had reasonable suspicion. Defendants, therefore, are also entitled to qualified immunity with respect to the extended detention.

2.   <u>The Arrest for DUI</u>

A warrantless arrest does not violate the Fourth Amendment if probable cause exists to believe that a suspect is violating or has violated the law.  <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 36, (1979).  Here, the facts known to the arresting officers included those which formed the basis for their reasonable suspicion that Byrnes had been driving under the influence of alcohol.  Additionally, that Byrnes refused, three times, to

35

follow Sullivan's directions to exit the car and submit to field
sobriety testing, is an additional fact supporting probable cause
to believe Byrnes was operating under the influence of alcohol.
See Wilder v. Turner, 490 F.3d 810, 815 (10th Cir. 2007)
("[I]ndicia of . . . alcohol consumption" supported officer's
reasonable suspicion of DUI "to justify detaining Plaintiff for
further investigation . . . .  From this detention, probable
cause developed when twice Plaintiff refused to participate in a
field sobriety test.").  See also Miller, 458 F.3d at 1259-60
("Whether or not Officer Harget had probable cause to arrest Mr.
Miller because the officer smelled alcohol coming from the
vehicle, the officer did have reasonable suspicion.  He
reasonably detained Mr. Miller in order to investigate whether he
had been driving under the influence.  From this detention,
probable cause developed, justifying Mr. Miller's arrest, because
Mr. Miller refused to take a breathalyzer test.")

     Similarly, the facts available to the arresting officers in
this case were "sufficient to warrant a prudent person, or one of
reasonable caution, in believing, in the circumstances shown,"
DeFillippo, 443 U.S. at 37, that Byrnes had been driving under
the influence of alcohol.  Indeed, Byrnes's own actions aided in
developing that probable cause.  Because defendants had probable

cause to arrest Byrnes, they are entitled to summary judgment on the merits of Count II.

In addition, because, under these circumstances, the existence of probable cause to arrest Byrnes for DUI was plainly at least "arguable," they are also entitled to qualified immunity from liability and suit.

II.  <u>Count III</u>

Byrnes alleges in Count III that his one hour detention, from the time he was arrested to the time he was released, violated his substantive due process rights.  He says that following his arrest, but prior to his release, defendants "placed him in a paddy wagon, carted him through the police station as a criminal, subjected him to finger printing, photographs, created a criminal record, effected an administrative license suspension, and then placed [him] in a jail cell."  Document No. 10-1, at 48.  He also alleges that after the arrest, but while he was still in custody, officers "had no facts available to them to justifiably detain and/or confine [him] to a jail cell."  Cmpt., Document No. 1-1, par. 48.

The circumstances described by Byrnes, even if true, do not rise to the conscience-shocking level necessary to support a

substantive due process claim.  County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) (substantive due process requires that actions of government official must be so egregiously abusive as to shock the conscience).  See also Mongeau v. City of Marlborough, 492 F.3d 14, 18 (1st Cir. 2007) ("[O]nly conscience-shocking behavior will constitute a substantive due process violation.").  The routine incidents of arrest Byrnes describes — transportation, booking, finger-printing, brief detention in a jail cell pending arrival of a companion — are all fairly typical and hardly conscience-shocking.

Byrnes has not shown that any of these routine law enforcement processes were carried out in an atypical or abusive manner.  The one hour detention (from the time of his arrest to the time he was released) was also fairly routine (and likely far less than the norm).  In Baker v. McCollan, 443 U.S. 137, 144-45 (1979), the Court "rejected, at least implicitly, any claim" that detention for three days "in the face of repeated claims of innocence" constituted a substantive due process violation.  Brady v. Dill, 187 F.3d 104, 108 (1st Cir. 1999) (citing Baker, 443 U.S. at 147-49 (Blackmun, J., concurring)).  Likewise, in Brady, the court found that "it would take circumstances much more egregious . . . to conclude that a weekend detention of approximately thirty-six hours, accompanied by a concerted effort

38

on the part of the police to secure the detainee's release,
resulted in a wrong of constitutional dimensions."  Brady, 187
F.3d at 109.  The officers' conduct in processing Byrnes on the
DUI case was not "conscience-shocking" in any sense, and cannot
support a substantive due process claim.


     Defendants, therefore, are entitled to summary judgment on
Count III.


III.  Count IV

     In Count IV, Byrnes alleges that the defendants violated his
Fourth Amendment rights by wrongfully initiating criminal
proceedings against him.  In his brief, Byrnes concedes that the
recent decision in Harrington v. City of Nashua, 610 F.3d 24 (1st
Cir. 2010), controls.  In that case, the court held that, where
an arrest is made without a warrant, an "arrest-based" malicious
prosecution claim is not cognizable under the Fourth Amendment.
Id. at 32.  It also held that ordinary "post-arraignment
deprivations of liberty associated with the conditions of . . .
pretrial release" do not form the basis of a Fourth Amendment
malicious prosecution claim.  Id.  Byrnes concedes as well that
"[a]pplying the precedent in that case to the facts in the
instant matter, Plaintiff may well fall short of establishing
facts needed to show a Fourth Amendment seizure . . . ."

Document No. 10-1, at 49.  But, he says, <u>Harrington</u> was wrongly decided.  <u>Id</u>.  That is an argument properly addressed to the court of appeals; this court is obligated to apply binding circuit precedent.  Application of <u>Harrington</u> to the facts of this case results in summary judgment on Count IV in favor of the defendants.

IV.  <u>Counts XI, XII, XIII, and XV</u>

    Because defendants are entitled to summary judgment on all of plaintiff's federal law claims, and in the interest of comity, the court declines to exercise supplemental jurisdiction over the remaining state law claims.  <u>See</u> <u>Camelio v. Am. Fed'n</u>, 137 F.3d 666, 672 (1st Cir. 1998).  There does not appear to be a state limitations bar to Byrnes's filing his state claims in state court.  <u>See</u> RSA 508:10; <u>O'Connor v. Commonwealth Gas Co.</u>, 251 F.3d 262, 273 (1st Cir. 2001) ("The running of the statute of limitations on a pendant claim . . . is a salient factor to be evaluated when deciding whether to retain supplemental jurisdiction.").

    Accordingly, the remaining state law claims are dismissed without prejudice to refiling in state court.

## Conclusion

For the reasons given, the court grants defendants' motion for summary judgment (document no. 6) in part.  Judgment shall be entered in favor of defendants on Counts I, II, III, and IV.  The court declines to exercise supplemental jurisdiction over the remaining state law claims.  Those claims are dismissed without prejudice to refiling in state court.


   **SO ORDERED.**

                                   _____
                                   Steven J. McAuliffe
                                   United States District Judge

January 31, 2012

cc:  Emile R. Bussiere, Jr., Esq.
     Keith F. Diaz, Esq.
     Robert J. Meagher, Esq.